No. 08-6236

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GARY T. WINNETT, FREDA JACKSON-CHITTUM, CASPER R. HARRIS,
WILLIAM H. DAILEY, CALVIN E. GROGAN, KENNETH C. HAMMER,
CHARLES A. WATERFIELD, and MICHAEL FINN,
on behalf of themselves and other similarly situated,

*Plaintiffs-Appellees*,

v.

CATERPILLAR INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee
Case No. 06-CV-0235, Hon. Aleta A. Trauger

## CATERPILLAR'S MOTION TO STAY THE DISTRICT COURT'S
## <u>SEPTEMBER 16, 2008 PRELIMINARY INJUNCTION PENDING APPEAL</u>

William G. Miossi                    C. R. Gangemi, Jr.
Steffen N. Johnson                   Joseph J. Torres
WINSTON & STRAWN LLP                 Derek G. Barella
1700 K Street, N.W.                  WINSTON & STRAWN LLP
Washington, D.C. 20006               35 West Wacker Drive
(202) 282-5000                       Chicago, Illinois 60601
wmiossi@winston.com                  (312) 558-5600
sjohnson@winston.com                 cgangemi@winston.com
                                     jtorres@winston.com
                                     dbarella@winston.com

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number:  08-6236_____          Case Name:  Gary T. Winnett, et al. v. Caterpillar Inc._

Name of counsel:  Joseph J. Torres_____

Pursuant to 6th Cir. R. 26.1,  Caterpillar Inc._____
                                             *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

Caterpillar Inc. does not have a parent corporation.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

No publicly owned corporations have a financial interest in the outcome of this litigation.

CERTIFICATE OF SERVICE

I certify that on _____October 31, 2008_____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joseph J. Torres_____

_____

_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## <u>INTRODUCTION</u>

This case involves the claims of approximately 4,500 former Caterpillar employees who retired between 1992 and 1998 and their surviving spouses. They claim Caterpillar breached an alleged promise of "lifetime cost-free retiree health care" under a labor contract with the UAW that expired 20 years ago. The district court previously ruled that the rights of the main class of plaintiffs to such benefits "vested" while they were still active employees, rather than upon retirement. This Court granted interlocutory review of that issue under 28 U.S.C. § 1292(b), took briefing and heard argument, and a decision is pending (Case No. 07-6275).

Meanwhile, the district court has now issued a preliminary injunction in favor of a group of approximately 275 plaintiffs known as the Caterpillar Logistics Services ("CLS") subclass. They purport to differentiate their claims from the main class by reference to a separate Caterpillar-UAW labor contract called the CLS Agreement, which became effective May 3, 1988, and which modified the 1988 Caterpillar-UAW labor contract. As the court saw it, even though these individuals retired between 1992 and 1998, pursuant to the CLS Agreement they retired under the 1988 labor contract and were not subject to the successor 1998 labor contract. The court thus enjoined Caterpillar to provide them with the same level of retiree medical benefits as is provided to those who retired before 1992.

1

This Court's review of the district court's injunction decision is needed because the district court erred as a matter of law by: (1) finding the CLS subclass' more than fifteen-year-old claims to be timely despite a six-year statute of limitations; (2) misinterpreting the CLS Agreement, thereby rendering nugatory one of its primary provisions; and (3) presuming irreparable harm to the entire 275-member subclass based on evidence of hardships befalling only 4 individuals, contrary to recent Supreme Court authority.  Each of these errors warrants reversal. *See, e.g.*, *Musto v. Am. Gen. Corp.*, 861 F.2d 897 (6th Cir. 1988) (vacating injunction based on erroneous contract interpretation); *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*, 696 F.2d 437 (6th Cir. 1982) (plaintiffs failed to demonstrate irreparable harm irremediable by monetary relief); *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100 (6th Cir. 1982) (same).

## JURISDICTION

On September 16, 2008, the district court entered the preliminary injunction now on appeal.  (R. 307, Prelim. Injunction Order).  Caterpillar filed its Notice of Appeal on October 16, 2008, and moved the district court pursuant to Federal Rule of Civil Procedure 62(c) to stay the injunction pending this appeal.  (R. 312-13, Mot. and Mem. to Stay).  The district court denied Caterpillar's motion on November 20, 2008.  (R. 321-22, Op. and Order Denying Mot. to Stay).  Pursuant

2

to Federal Rule of Appellate Procedure 8(a), Caterpillar requests this Court stay the district court's preliminary injunction.

## STATEMENT OF FACTS

### Caterpillar Logistics Services and the Negotiation of the CLS Agreement

Caterpillar Logistics Services, Inc. was formed as a Caterpillar subsidiary in 1987 to market the Company's warehousing and product distribution expertise to third-party customers. (R. 298, Hearing Tr. 323-24[1]).  An impediment to marketing Caterpillar's logistics expertise to third-parties was that much of its parts distribution network was located in UAW-represented facilities.  Caterpillar expected customers would be reluctant to place their product in facilities subject to UAW strikes unrelated to their businesses.  (*Id.*).

Caterpillar discussed this issue with the UAW in 1987, seeking to secure the UAW's promise that employees performing CLS work would not impede this third-party business even if a Caterpillar-UAW labor dispute arose.  (*Id.* at 324-26).  The UAW, in turn, wanted as much CLS work as possible placed in UAW-represented facilities to the benefit of the UAW bargaining unit; but, after decades of securing uniform terms across all UAW-represented facilities, the UAW did not want this arrangement to result in some employees receiving different terms of

---

[1]    References are made to the transcript of the preliminary injunction hearing held July 8-10, 2008.  The parties' hearing exhibits have not been assigned docket numbers in the district court, but are designated as part of the record on appeal.

3

employment than others.  (R. 297, Hearing Tr. 44-47, 57, 68, 75-76, 81; R. 298, Hearing Tr. 316, 320, 326, 330, 346-49, 404; Pl. Ex. 13).

Caterpillar and the UAW settled the CLS Agreement, which was ratified by the entire UAW bargaining unit (including the CLS subclass, all of whom were active employees at that time).  (R. 298, Hearing Tr. 334, 347, 402-08; Pl. Ex. 13). The CLS Agreement addressed the parties' concerns and priorities as follows:

- The CLS Agreement applied to "Covered Employees," defined to include "any employees within units covered by the Central Labor Agreement and who were engaged in work involving Caterpillar parts distribution or CLS work."  (Pl. Ex. 1, Sec. 1(c));

- Section 3 addressed Caterpillar's concerns about work stoppages by providing that Covered Employees "shall not participate in any work stoppage during the term of the CLS Agreement, notwithstanding the expiration of the CLA or any other no-strike promise."  (*Id.*, Sec. 3);

- Section 5(a) addressed the UAW's concern of ensuring parity in employment terms for CLS employees who would be foregoing their right to strike in future contract negotiations:

  (1) the first paragraph provided that upon the expiration of a labor contract applicable to Covered Employees, that contract would be considered to continue in full force and effect with respect to Covered Employees.  (*Id.*, Sec. 5(a)); and

  (2) The second paragraph continued that when Caterpillar and the UAW agreed upon a successor labor contract, all of its terms "[would] become automatically applicable to such Covered Employees."  (*Id.*).

### Caterpillar's 1992 Changes to Retiree Medical Benefits

The CLS Agreement was first triggered in late 1991, when the 1988 labor contract between Caterpillar and the UAW expired, and the UAW called a work

stoppage.  (R. 76, Stevens Aff. ¶¶ 14-18).  Pursuant to the CLS Agreement, the UAW did not strike at CLS operations.  (R. 247, Stevens Dec. ¶¶ 12-17).

When continued negotiations failed to produce agreement, Caterpillar declared impasse and advised the UAW and its members that, effective April 6, 1992, it would unilaterally implement portions of its final offer.  (R. 298, Hearing Tr. 375-77; Def. Ex. 32).  In December, 1992, with the parties still at a bargaining impasse, Caterpillar implemented additional portions of its final offer. (R. 298, Hearing Tr. 382-86; Def. Ex. 36).

Caterpillar's 1992 implementations made extensive changes to medical coverage for all post-1991 retirees, including: (1) establishing a preferred provider NetWork whereby employees and retirees receive fully-paid services from in-NetWork providers, but incur co-pays for out-of-NetWork services; (2) a cap on the Company's level of contribution for future retiree medical costs; and (3) various other substantive changes, including a different retiree eligibility formula, eliminating the ability to add new dependents after retirement, and other limits on existing coverages. (R. 298, Hearing Tr. 375-86; Def. Ex. 32, 36, 37).

While the CLS employees continued to work under the terms of the 1988 labor contract, Caterpillar's bargaining proposals and implemented terms, including the retiree medical benefits changes, were communicated to all UAW members

and retirees through Company and Union publications.  (R. 298, Hearing Tr. 275-76; R. 299, Hearing Tr. 500-14, 524-34; Def. Ex. 65).

### The 1998 Caterpillar-UAW Labor Contract Settlement

Caterpillar and the UAW continued negotiations until March, 1998, when they settled a new labor contract that incorporated and ratified Caterpillar's 1992 implemented retiree medical changes.  (R. 76, Stevens Aff. ¶ 27, Ex. 14-15; R. 247, Stevens Dec. ¶ 18).  The parties also agreed to contribute $35 million that had previously accrued for active employees to a voluntary employee benefits association ("VEBA") to pay above-the-cap expenses incurred by post-1991 covered retirees and their dependents.  (R. 298, Hearing Tr. 387-90; Def. Ex. 40).  Caterpillar and the UAW understood the VEBA was a short-term measure, and would serve only to delay the date on which retirees would begin paying above-the-cap costs for medical insurance.  (R. 298, Hearing Tr. 390).

Pursuant to Section 5(a) of the CLS Agreement, the 1998 labor contract was applied to the CLS retirees, including all of the retiree medical changes noted above.  (R. 298, Hearing Tr. 395-400, 404, 408, 415-19; Def. Ex. 44).  In 1998, Caterpillar issued written "Benefit Changes" announcements to employees and retirees, *including the CLS subclass*, that explained these changes to retiree medical benefits.  (R. 298, Hearing Tr. 454-58; Def. Ex. 45-47).  Caterpillar also

6

sent a new Summary Plan Description ("SPD") to CLS retirees before the end of 1999, which explained the benefits changes in greater detail.  (*Id.*).

## THE DISTRICT COURT'S PRELIMINARY INJUNCTION

In its preliminary injunction decision, the district court held that by application of the CLS Agreement, when CLS employees retired between 1992 and 1998, they retired under the expired 1988 labor contract.  (R. 306, Op. at 27). The court also held that the CLS subclass had "vested" in their benefits under the 1988 labor contract and, therefore, Caterpillar's changes to those benefits, including the changes referenced in the 1992 implementations and in successor 1998 and 2004 labor contracts, could not be applied to this population. (*Id.* at 42).

Accordingly, the district court directed Caterpillar to provide the CLS subclass with the same retiree medical benefits as are currently provided to pre-1992 retirees who were represented by the UAW at retirement.  (R. 307, Order). Notably, these pre-1992 retirees do not receive the "lifetime cost-free retiree health care" the CLS subclass claims it is entitled to under the 1988 contract.

## STANDARDS GOVERNING THIS
## MOTION TO STAY PENDING APPEAL

In deciding a motion to stay a preliminary injunction pending appeal, the Court considers whether: (1) the movant has a strong likelihood of success on the merits, (2) the movant would suffer irreparable injury absent a stay, (3) granting the stay would cause substantial harm to others, and (4) the public interest would

be served by granting the stay.  *U. S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008).  The Court reviews *de novo* the district court's legal conclusions, and reviews its factual findings for clear error.  *Id.*  When the Court considers a motion to stay, it is not reviewing the grant of the injunction itself and is "therefore not bound to defer to [the district court's] judgment."  *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991).

The preliminary injunction should be stayed because the district court committed three reversible legal errors.  First, it departed from precedent and employed an unworkable standard that allowed Plaintiffs' fifteen-year-old claims to circumvent the applicable six-year statute of limitations; second, the lower court construed the CLS Agreement to give effect to one provision, but rendering nugatory another operative provision in the same section of the agreement; and third, it improperly presumed the entire subclass would suffer irreparable harm based on evidence limited to the individualized circumstances of only 4 of 275 subclass members.  Each of these errors stems from a legal conclusion, thus they are reviewed *de novo*.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007).

## THE CLS SUBCLASS CLAIMS ARE UNTIMELY, AND THE DISTRICT COURT'S DETERMINATION OTHERWISE IS CONTRARY TO THE UNDISPUTED FACTS AND THIS CIRCUIT'S PRECEDENT.

The claims in this lawsuit challenge changes to retiree medical benefits that were implemented in 1992, incorporated into a successor labor contract in 1998, applied to the CLS retirees beginning in 1998, and explained to the CLS subclass on repeated occasions from 1992 onward.  Yet, the Plaintiffs did not assert these claims until 2006.  Notwithstanding these facts, the district court allowed the CLS subclass to circumvent the applicable statute of limitations through *post hoc* assertions that some changes to their supposedly vested benefits were *acceptable* to them and, therefore, did not trigger the accrual of their claims.  The district court committed reversible error in endorsing this manipulation.

The material facts are undisputed.  Tennessee's six-year statute for actions based on written contracts applies.  Given that the complaint in this matter was filed in March, 2006, the CLS subclass' claims must have accrued no earlier than March, 2000, in order to be timely.  But the facts of this case show as follows:

- The 1988 Caterpillar-UAW labor contract expired in November, 1991.

- In 1992, Caterpillar declared impasse in bargaining and lawfully implemented the subject changes to retiree medical benefits.

- In 1998, the implemented caps, NetWork provisions and other changes to retiree medical benefits were incorporated into the 1998 labor contract and applied to the CLS subclass.

- In 1998 and 1999, the CLS subclass received repeated mailings, including a Summary of Benefits Changes, a NetWork booklet and a fully-explicated SPD, detailing these changes to their supposedly unalterable benefits.

9

The CLS subclass knew as early as 1992 that Caterpillar had repudiated its alleged obligation to provide unalterable "no cost" retiree health benefits.[2]  By 1998 and 1999, the CLS subclass had received detailed written notices describing all the changes to their benefits—changes that were already in place and affecting the subclass population.  *See, e.g.*, *Hirt v. Equitable Retirement Plan for Employees*, 450 F. Supp. 2d 331 (S.D.N.Y. 2006) (court found claims untimely based on SPD describing changes to become effective in the future).

The district court held that the CLS subclass claims were nevertheless timely because: (1) certain of the changes to the subclass' supposedly unalterable benefits—namely, the NetWork provisions—were now acceptable to the subclass and/or were too *de minimis* to trigger the statute of limitations; and (2) the institution of the retiree medical cost caps was too uncertain and contingent on future events to be a clear repudiation of the subclass' alleged vested benefits.  The district court's holding has no support in the record or this Court's precedent.

The CLS subclass presented no witnesses who testified that they considered some changes to their retiree benefits to be acceptable, while others were not,

---

[2]    The CLS subclass argued to the district court that the correspondence they received concerning Caterpillar's proposals and 1992 implementations did not put them on notice because the implementations did not apply to them at that time. But the CLS subclass knew that whatever new employment terms resulted from the ongoing negotiations would automatically apply to them as well.  In any event, there is no question the CLS subclass' benefits *were changed* beginning in 1998, rendering their claims untimely by almost two years.

while still others were trivial. If they had, such testimony would be contravened by the Amended Complaint, which alleges that Caterpillar changed retiree medical benefits under the 1988 labor contract by charging above-the-cap premiums *and* by requiring "the named plaintiffs and Class members . . . to pay increased charges for drug prescription co-pays, deductibles and other out-of-pocket expenses." (R. 61, Amd. Comp. ¶¶ 29-30). The Amended Complaint claims generally that "Caterpillar's reductions in retiree healthcare" violated the CLS subclass' rights to alleged vested benefits. (*Id.* ¶ 59).

A claim accrues under Section 301 when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation. *Garrish v. UAW*, 417 F.3d 590, 594 (6th Cir. 2005); *Biros v. Spalding-Evenflo Co.*, 934 F.2d 740, 743 (6th Cir. 1991); *Adkins v. Int'l Union of Elec., Radio & Mach. Workers*, 769 F.2d 330, 334 (6th Cir. 1985). "[T]he rule governing when a cause of action accrues is the 'clear repudiation' rule. This rule provides that when a fiduciary gives a claimant clear and unequivocal repudiation of benefits[,] that alone is adequate to commence accrual, regardless of whether the repudiation is formal or not." *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006); *see also Allen v. United Food & Commercial Workers Int'l Union*, 43 F.3d 424 (9th Cir. 1994).

In spite of this precedent, the district court erroneously allowed the CLS subclass to decide, *post hoc*, which of the changes to their supposed "lifetime no cost" benefits they were willing to endure and/or discount other changes as *de minimis* or contingent.  This is error because it erects a subjective framework whereby plaintiffs can circumvent the statute of limitations by parsing through their basket of welfare benefits and choosing to endure some changes and/or subjectively deeming other changes *de minimis*[3] or sufficiently contingent.  Such a premise is directly contrary to this Court's precedent.  *See* discussion *supra*.

The evidence shows that Caterpillar repeatedly repudiated any obligation to provide "lifetime no cost" benefits to the CLS subclass beginning in 1992 and continuing through 1999 when it issued an SPD to this population specifically delineating all of the changes to their supposedly free benefits.  The CLS subclass' claims are untimely by more than two years; the district court's contrary conclusion is in error and should be overturned.

## THE DISTRICT COURT'S INTERPRETATION OF THE CLS AGREEMENT RENDERED MATERIAL TERMS NUGATORY, IN CONTRAVENTION OF SIXTH CIRCUIT LAW.

---

[3] Thus, if an employer changed supposedly vested medical benefits by eliminating vision coverage, apparently the claim would accrue for someone with bad vision while that same change could be tolerated as *de minimis* by a retiree with good eyesight.

12

Even if the CLS subclass' claims are not time-barred, they are without merit as the CLS Agreement did not vest them in benefits under the expired 1988 labor contract. In its injunction decision, the district court held that the CLS subclass had shown a likelihood of successfully proving: (1) that the CLS Agreement extended the 1988 labor contract beyond its expiration for the CLS subclass such that they retired under that contract; and (2) that the 1988 labor contract provided a vested right to lifetime no-cost retiree benefits. (R. 306, Op. at 19). The district court's first conclusion is demonstrably wrong.[4]

The district court's analysis centered on its assertion that the CLS Agreement applied only to "Covered Employees," and its conclusion that "Covered Employees" included only active workers performing CLS work, not retirees. (*Id.* at 22-25). Proceeding from this premise, the district court read the first paragraph of Section 5(a) of the CLS Agreement to extend the 1988 labor contract beyond its expiration for active employees performing CLS work. *Id.* But the court then found that when those CLS employees retired, they retired under the terms of the 1988 labor contract and ceased to be "Covered Employees" under the CLS Agreement for any other purpose. Therefore, according to the district court, the 1998 labor contract did not apply to them. *Id.*

---

[4] Caterpillar does not concede the second point (*i.e.*, that the 1988 labor contract provided vested benefits). However, in this appeal, Caterpillar submits the injunction should be vacated regardless of the vesting question.

The flaw in the district court's decision is that it allows the CLS subclass to pick and choose which paragraphs of Section 5(a) of the CLS Agreement that they will, and will not, accept. Clearly, the subclass' theory of liability depends upon the application of the first paragraph of Section 5(a) to extend the 1988 labor contract beyond its expiration. Just as clearly, however, the CLS subclass disavows the ensuing paragraph in that same Section 5(a), by which they agreed that "all terms of the new [1998] Central Labor Agreement" would be "automatically applied" to them. But the second paragraph of Section 5(a) cannot be divorced from the first. It is central to the contracting parties' agreement, which was to simultaneously ensure labor at CLS operations notwithstanding a strike elsewhere *and* absolute parity in employment terms across the bargaining unit.[5]

The CLS subclass (along with the rest of the bargaining unit) accepted these terms in 1987 when they ratified the CLS Agreement. As active employees, they authorized their bargaining representative to negotiate their terms of employment, which necessarily included their future retirement benefits, and agreed that

---

[5]    Even if the competing interpretations of the CLS Agreement give rise to an ambiguity, the extrinsic evidence of the contracting parties' intentions is clear. *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 443 (6th Cir. 2007). The UAW did not object to the application of the 1998 contract to the CLS subclass. The CLS retirees also accepted the terms of the new agreement, including various enhancements to their pensions and other benefits for eight years before filing this lawsuit in 2006.

notwithstanding the temporary extension of the prior expired agreement, "all terms" of any successor agreement would "automatically apply" to them.[6]

Thus, the district court's injunction decision reads the second paragraph of Section 5(a) out of the CLS Agreement, in contravention of established precedent instructing that labor contract provisions must be read as a whole and "so as to render none nugatory." *Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1480 (6th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984); *see also Paper Workers Int'l Union v. Air Prods. & Chems., Inc.*, 300 F.3d 667, 676-78 (6th Cir. 2002).[7] The district court's decision is wrong, and Caterpillar is likely to prevail on appeal concerning the appropriate construction of the CLS Agreement.

---

[6]    Because the future retirement benefits of active employees are a mandatory subject of bargaining, *Allied Chem. & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180 (1971); *Bastian-Blessing v. NLRB*, 474 F.2d 49, 54 (6th Cir. 1973), there is nothing unusual about active employees in 1987 agreeing that their future benefits would be the same as what was provided to the rest of the bargaining unit under the successor labor contract.

[7]    Even accepting the district court's conclusion that the CLS Agreement ceased to apply to an individual upon retirement, it still does not follow that the CLS subclass retired under the 1988 labor contract. Following the district court's analysis to its logical end, once the CLS subclass members retired out of the CLS Agreement such that Section 5(a) ceased to apply, so too did the extended 1988 labor contract. But for the CLS Agreement, the 1988 labor contract had expired. *Bauer v. RBX Indus., Inc.*, 368 F.3d 569, 579 (6th Cir. 2004) (court lacks jurisdiction over claims based on expired or superseded labor contracts). And as retirees who could no longer claim any rights under the CLS Agreement, the CLS subclass should have been covered upon retirement by the terms applicable to non-CLS employees and retirees prior to 1998—namely, the 1992 implemented terms.

15

## THE DISTRICT COURT IMPROPERLY PRESUMED IRREPARABLE HARM TO THE ENTIRE SUBCLASS BASED UPON EVIDENCE CONCERNING ONLY A HANDFUL OF INDIVIDUALS.

While the CLS subclass discounts the changes that occurred in 1998 as *de minimis* in an effort to avoid the statute of limitations, they argued below that other cost-sharing changes to their retiree medical benefits that occurred in 2004 caused irreparable harm inasmuch as they led subclass members to suffer financial anxiety and to forego needed medical care. But the subclass presented testimony from only 4 witnesses to support this contention, and offered no testimony whatsoever demonstrating that these few witnesses' alleged hardships could be attributed to other subclass members. In fact, these witnesses readily conceded they had *no knowledge* whether other class members were similarly situated or afflicted. (R. 297, Hearing Tr. 216, 238). Moreover, for a large majority of the CLS subclass, Caterpillar medical coverage is secondary to Medicare.

The district court's extrapolation of irreparable harm to the entire subclass based on this minimal evidence is at odds with established Supreme Court precedent and constitutes reversible error. In *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), the Supreme Court expressly held that presuming irreparable harm when deciding whether to grant injunctive relief is "contrary to traditional equitable principles." Because the Ninth Circuit had done just that—presumed irreparable harm—the Supreme Court reversed the preliminary

16

injunction. The Court concluded that unless a statute clearly mandates injunctive relief for a particular set of circumstances, courts must employ traditional equitable considerations in deciding whether to grant such relief. *Id.* at 542-44.

In two recent cases the Supreme Court has reemphasized this same point. In *eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388, 391 (2006), the Court, citing *Amoco*, reiterated that "major departures from the long tradition of equity practice should not be lightly implied" and that absent congressional intervention to the contrary, a plaintiff must satisfy *all* elements of the traditional four-factor test before a court can grant equitable relief. *See also Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374-76 (2008).

The Court's opinion in *Winter* is particularly instructive. In *Winter*, the Ninth Circuit affirmed a preliminary injunction precluding the United States Navy from using mid-frequency active sonar during training exercises. According to the Ninth Circuit, the use of MFA sonar created a "possibility" of irreparable harm. The Court reversed, finding that the Ninth Circuit's "possibility" standard failed to require a sufficient showing to support such an "extraordinary remedy":

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* at 375-76.

17

The Third Circuit's decision in *Adams v. Freedom Forge Corp.* 204 F.3d 475 (3d Cir. 2000), faithfully applied these principles in the same factual setting presented here. In *Adams*, 136 retirees sued challenging changes to their retiree medical benefits. The Third Circuit concluded that at a minimum, the plaintiffs seeking injunctive relief were required to present evidence to establish that all of the individual plaintiffs were similarly situated. In language resonant of the Supreme Court's admonitions in *Amoco*, *eBay*, and *Winter*, the Third Circuit held:

> The law does not take judicial notice of matters of "common sense," and common sense is no substitute for evidence. A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties. The elasticity that the opposite conclusion would permit would essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head. *Id.* at 487-88.

Instead of following the Third Circuit's lead in *Adams*, the district court dismissed *Adams* as inconsistent with this Court's decisions in *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) and *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006).[8] (R. 306, Op. at 45-47). Caterpillar acknowledges that in *Golden* and *Yolton*, this Court affirmed injunctions on behalf

---

[8]    The district court also relied on *United Steelworkers of Am. v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987), wherein the First Circuit found a preliminary injunction was appropriate based on "generally believed facts" about the plaintiffs-retirees' situations, rather than specific evidence of irreparable harm. In *Adams*, the Third Circuit expressly considered and rejected the *Textron* approach.

18

of retiree classes challenging changes to their medical benefits. Caterpillar respectfully submits, however, that neither case presented the issue raised here.[9]

This Court appears to have come closest to addressing this issue in *Wood v. Detroit Diesel Corp.*, 213 F. App'x 463 (6th Cir. 2007). The district court in *Wood* observed that the Sixth Circuit had not "decided whether irreparable harm, in a motion for preliminary injunction in a class setting, must be shown for virtually all members of the class involved." *Wood v. Detroit Diesel Corp.*, 2005 WL 3579169, at \*6 (E.D. Mich. Dec. 30, 2005). Citing *Golden*, the district court concluded such evidence was not required. *Id.* at \*7. This Court affirmed.

Whichever of its cases this Court deems pertinent to this issue, all such decisions must be refracted through the Supreme Court's decisions in *Amoco*, *eBay*, and *Winter*—all of which were either absent from the parties' arguments to this Court in previous cases or were decided after this Court's relevant decisions. With the benefit of the Supreme Court's decisions, Caterpillar submits this Court will reach a result similar to the Third Circuit's decision in *Adams* and conclude that the district court erred in presuming irreparable harm.

---

[9]    In *Golden*, the defendant argued before the district court that the plaintiffs had not established irreparable harm across the class because they had not presented affidavits from individuals who retired out of two of the company's three divisions. The defendant did not pursue this argument before this Court, however, and the parties did not brief *Amoco*. In *Yolton*, the parties did not contest the district court's findings on irreparable harm.

When the district court's erroneous presumption of irreparable harm is set aside, it is clear that the CLS subclass' limited evidence of irreparable harm cannot justify the "extraordinary remedy" of a preliminary injunction.  The subclass' evidence was specific to the four witnesses who testified, and their testimony did nothing to establish that all or any of the other 275 individual plaintiffs were similarly situated.  In fact, as noted, it did *just the opposite*.  Thus, the likelihood of reversal of the district court's preliminary injunction is high.

## <u>CONCLUSION</u>

The public interest suffers when an injunction is wrongly issued, even pending appeal.  Caterpillar requests that the Court stay district court's September 16, 2008 preliminary injunction pending appeal of the merits, on which Caterpillar has a strong likelihood of success.

Respectfully submitted,

CATERPILLAR INC.

By:    /s/ Joseph J. Torres

William G. Miossi
Steffen N. Johnson
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000
wmiossi@winston.com
sjohnson@winston.com

C. R. Gangemi, Jr.
Joseph J. Torres
Derek G. Barella
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600
cgangemi@winston.com
jtorres@winston.com
dbarella@winston.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Appellant, Caterpillar Inc., hereby certifies that a copy of the foregoing Motion to Stay September 16, 2008 Preliminary Injunction Pending Appeal has been filed electronically and service will be made through the Court's ECF system, and that a copy also has been sent to the following counsel of record by U. S. Mail on December 12, 2008, as noted below:

Michael M. Mulder
Meites, Mulder, Mollica & Glink
20 South Clark Street
Suite 1500
Chicago, IL  60603

Jay E. Sushelsky
AARP
601 E Street, N.W.
Washington, DC  20049

William T. Payne
Stember Feinstein Doyle &
Payne, LLC
Pittsburgh North Office
1007 Mt. Royal Blvd.
Pittsburgh, PA  15223

Elizabeth A. Alexander
Lieff, Cabraser, Heimann &
Bernstein, LLP
One Nashville Place
150 Fourth Avenue N, Suite 1650
Nashville, TN  37219

John Stember
Pamina Ewing
Stember Feinstein Doyle &
Payne, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219

I declare that the statements above are true to the best of my information, knowledge and belief.

_____/s/ Joseph J. Torres_____
Joseph J. Torres

Dated: December 12, 2008

21